UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DELPHI AUTOMOTIVE SYSTEMS, LLC,

    Plaintiff/Counter-Defendant,

v.

IEP TECHNOLOGY, INC., *et al.*,

    Defendants/Counter-Plaintiffs.

Case No. 17-10676
Honorable Laurie J. Michelson

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANT'S MOTION TO DISMISS COUNTER-COMPLAINT [27]**

Delphi Automotive Systems, Inc. and IEP Technology, Inc. worked together for several years to develop geothermic fuel cell technology. IEP and its affiliate company, IEP Technology, Inc. ("IEPT"), ordered several tests from Delphi pertaining to this technology. IEP and IEPT failed to fully pay Delphi for these tests. As a result, the parties entered into two promissory notes, a security agreement, and a guaranty to secure the remaining payments. When the IEP entities still failed to pay, Delphi brought this breach of contract lawsuit to collect on these agreements. IEP and IEPT filed a counter-complaint alleging that Delphi breached a separate contract and made misrepresentations to IEP and IEPT by failing to inform them that Delphi was leaving the fuel cell business.

Delphi has moved to dismiss the Amended Counter-Complaint pursuant to Rule 12(b)(6). (R. 27.) The motion is fully briefed (R. 31, 32) and the Court heard argument on November 21, 2017. For the reasons stated below, the motion is granted as to Counts I, III, and IV, and denied as to Count II.

**I.**

IEP alleges that, while in "an ongoing relationship" with Delphi, the parties "entered into an agreement" in October 2012 for Delphi to supply geothermic fuel cell technology to IEP. (R. 24, PID 366.) During that time, IEP issued two purchase orders to Delphi "for goods and services involving geothermic fuel cell technology." (R. 1, PID 5.) IEP and IEPT made some payments on the orders, but were unable to pay the final $716,890. (*Id.*)

In October 2013, Delphi and IEP signed a Memorandum of Understanding ("MOU"). The MOU states, in part:

> This Memorandum of Understanding ("MOU") seeks to clarify and agree to [sic] the intended framework under which a long term business relationship would develop for the mutual benefit of both parties. Upon execution of this MOU and the successful initial field demonstration, the parties shall, in good faith, seek to work out the details of a formal joint technology development agreement expressing the rights and obligations of the two parties (the "Agreement").
>
> The parties expressly understand and agree that neither party shall have any obligation or commitment to enter into an Agreement or to otherwise engage in business activities with the other party unless and until the terms of such business relationship is accepted by the parties' respective management and the Agreement is executed by authorized representatives of both of the parties. The parties agree that the terms of the MOU are not legally binding.

(R. 24-2, PID 380.) The MOU then lays out several pages of "intended terms of the Agreement." (R. 24-2, PID 381–84.) The MOU closes:

> Either party has the right to terminate discussions at any time and for any reason prior to entering into the definitive Agreement contemplated by this MOU, provided, that the terms and conditions set forth in the October 2, 2012 GFC Quotation Letter shall remain in full force and effect.

(R. 24-2, PID 384.)

On September 23, 2014, IEPT and Delphi executed a promissory note addressing IEP's unpaid balance of $716,690.00, plus interest, from the October 2012 orders. (R. 24-5, PID 392–95.) That same day, IEP signed a continuing guaranty agreement in which IEP agreed to pay the

amounts owed if IEPT did not. (R. 24-7, PID 408–10.) After two successful payments, IEPT failed to make the final installment payment of $516,890.00. (R. 24-5, PID 396.) Delphi sent IEPT a Notice of Default. (*Id.*) The remaining payment was not made.

On August 1, 2015, IEPT and Delphi signed an amended promissory note. (R. 24-5, PID 396–98.) The amended promissory note added unpaid sums from two other orders, which, after interest, amounted to $848,933.00. (R. 24-5, PID 396.) The amount was owed on or before July 31, 2016. (R. 24-5, PID 397.) Delphi secured the amended promissory note with a security interest in IEPT's intellectual property, formalized in a security agreement. (R. 24-6, PID 400–06.)

On October 4, 2016, IEPT's president sent a letter to Delphi discussing efforts to "conclude a transaction" in order to "retire the obligations under [IEPT's] Promissory Note with Delphi." (R. 24-3, PID 386.)

The same day, IEPT sent another letter to Delphi regarding the "unannounced shutdown of Delphi Fuel Cell Operations." (R. 24-4, PID 389–90.) The letter indicated that the president of IEPT was shocked and upset after learning that Delphi had shut down its fuel cell program a year earlier, in September 2015. (R. 24-4, PID 389.) The president stated that "in virtually all communications with [the] parties we have been in contact with to date, Delphi has been represented as our strategic manufacturing partner for fuel cell products, expertise and support." (R. 24-4, PID 389.) IEPT's president stated that he viewed Delphi's failure to promptly communicate its decision to leave the fuel cell business as "contrary to the stated purpose(s) of the 'Joint Governance Board' provided for in the MOU." (R. 24-4, PID 389.)

On November 3, 2016, Delphi responded. (R. 24-9, PID 416.) Delphi stated:

> The last opportunity to fund the project was lost when we (Delphi & IEP) were not selected for the ARPA-E award for our submission under DE-FOA-1261. This notification came on October 16, 2015, of which you were informed by Mark Wall. The significant budget overage caused by IEP's default left us with no other choice

3

but to reduce our spending to limit our financial exposure. With only ten weeks remaining in the quarter, we were forced to reassign and separate the technical personnel remaining on the project, and begin to shut-down [sic] our facilities to conserve cash. These are actions that any fiscally-responsible company would take. I did report this situation to Mark Wall during a telephone conversation on January 27, 2016. At that time, all efforts for repayment of IEP's debt were focused on monetizing your mineral rights and finding a buyer.

(R. 24-9, PID 416.) The letter continued:

Your decision to negotiate potential funding projects for Cascata Energy, LLC on behalf of Delphi, was done at your own risk, as there are no formal agreements between Delphi and Casacata. In fact, paragraph 17 of the Delphi/IEPT Proprietary Information/Non-Analysis Agreement Dated January 1, 2014, prohibits the use of Delphi's name without first receiving written consent. Be advised that Delphi will take immediate action should you elect not to accept the offered extension of the First Amended Promissory Note.

(R. 24-9, PD 416.)

Delphi sent another letter to IEPT on January 19, 2017 (erroneously dated as 2016) trying to resolve IEPT's outstanding debts to Delphi. (R. 24-10, PID 418.) The letter states that Delphi will settle the amounts owed under the First Amended Promissory Notes in exchange for payment of $300,000. (*Id.*) Delphi would also transfer title to certain projects the parties had worked on, release its security interest in IEP's intellectual property, and terminate the Continuing Guaranty. (*Id.*) The offer would automatically expire at 5:00 p.m. on February 17, 2017, unless accepted or withdrawn prior to that time. (*Id.*) And Delphi provided notice that it was terminating further discussions per Section R of the MOU such that all terms of the MOU were terminated. (*Id.*)

On February 9, 2017, Delphi sent IEPT a Notice of Default under the First Amended Promissory Note and Security Agreement. (R. 24-11, PID 420–21.) In that Notice, Delphi withdrew its January 19, 2017, settlement offer and rejected IEPT's settlement counter-proposal. (R. 24-11, PID 420–21.)

In March 2017, Delphi filed this lawsuit seeking to enforce the promissory notes, guaranty, and security agreement. (R.1.) The next month, IEP and IEPT filed an amended counter-complaint seeking to recover damages for Delphi's alleged failure to inform IEP and IEPT that it had decided to leave the fuel cell business. (R. 24.) The IEP entities assert four claims: silent fraud, innocent misrepresentation, negligent misrepresentation, and breach of contract. (R. 24.)

Delphi has moved to dismiss the counter-complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.

When a defendant or, here, a counter-defendant, moves to dismiss pursuant to Rule 12(b)(6), the plausibility standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), governs. Under that standard, a court first culls legal conclusions from the complaint, leaving only factual allegations to be accepted as true. *Iqbal*, 556 U.S. at 679. The inquiry then becomes whether the remaining assertions of fact "allow[] the court to draw the reasonable inference that the defendant is liable[.]" *Id.* at 678. Although this plausibility threshold is more than a "sheer possibility" that a defendant is liable, it is not a "'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). Whether a plaintiff (or counter-plaintiff) has presented enough factual matter to "'nudg[e]'" his claim "'across the line from conceivable to plausible'" is "a context-specific task" requiring this Court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 683 (quoting *Twombly*, 550 U.S. at 570).

## III.

Delphi seeks to dismiss both the contract and tort claims raised in the counter-complaint. The Court begins with the tort claims.

5

## A.

Silent fraud, also called fraudulent concealment, prohibits "[a] fraud arising from the suppression of the truth[.]" *MacDonald v. Thomas M. Cooley Law School*, 724 F.3d 654, 665 (6th Cir. 2013) (internal citations omitted). To state a claim for silent fraud under Michigan law, "a plaintiff must allege more than non-disclosure; a plaintiff must establish that the defendant had 'a legal duty to make a disclosure.'" *Id.* at 665–66. Such a legal duty "arises 'most commonly in a situation where inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information.'" *Id.* at 666.

IEP and IEPT's silent fraud claim fails to state a claim for two reasons.

First, IEP and IEPT do not allege that they specifically asked Delphi about Delphi's future plans for remaining in the fuel technology business. "This failure to inquire dooms the silent-fraud claim." *Id.*

Second, IEP and IEPT acknowledge that any duty of disclosure owed by Delphi arose from the MOU. According to IEP and IEPT, "While Delphi ordinarily would not have had an obligation to inform IEP of their decision, when they entered into the MOU *it created an equitable obligation* to inform the other party that they had decided to leave or had terminated their fuel cell business." (R. 31, PID 546 (emphasis added).) But, "Under Michigan law, a defendant acting pursuant to a contract is liable in tort only if he or she 'owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations.'" *Ram Int'l., Inc. v. ADT Sec. Serv., Inc.*, 555 F. App'x. 493, 497 (6th Cir. 2014) (quoting *Fultz v. Union-Commerce Assocs.*, 683 N.W.2d 587, 592 (Mich. 2004)); *see also Rinaldo's Const. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647, 656 (Mich. 1997) ("[T]he threshold inquiry is whether the plaintiff alleges a violation of a legal duty separate and distinct from the contractual obligation."). "[I]f a relation exists which would give rise to a

legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not." *Hart v. Ludwig*, 79 N.W.2d 895, 898 (Mich. 1956) (citation omitted). As will be discussed below, the essence of IEP and IEPT's breach-of-contract claim is that Delphi made misrepresentations regarding its future in the fuel cell business. As IEP and IEPT do not identify an independent basis for why Delphi would owe them a duty of disclosure apart from any duty under the MOU, IEP and IEPT's silent-fraud claim fails as a matter of law.

The same is true for IEP and IEPT's negligent-misrepresentation claim. This claim "requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care *by one who owed the relying party a duty of care*." *Alfieri v. Bertorelli*, 813 N.W.2d 772, 775 (Mich. Ct. App. 2012) (internal quotations omitted) (emphasis added). As Delphi's duty of care is again alleged to arise from the MOU, this claim fails as well.

**B.**

In addition to negligent misrepresentation, IEP and IEPT also assert a claim for innocent misrepresentation. (R. 24, PID 372–73.) Innocent misrepresentation is a type of fraud that applies only to parties in privity of contract and therefore does not require the plaintiff to plead a separate duty between the parties. *See United States Fid. & Guaranty Co v. Black*, 313 N.W.2d 77, 85 (Mich. 1981). Further, because of this privity requirement, the claim does not require proof that the defendant intended for the plaintiff to act upon the misrepresentation. *Id*. In sum, "[t]he innocent misrepresentation rule represents a species of fraudulent misrepresentation" but does not require a plaintiff "to prove a fraudulent purpose or an intent on the part of the defendant that the misrepresentation be acted upon by the plaintiff[.]" *M&D, Inc. v. W.B. McConkey*, 585 N.W.2d 33, 37 (Mich. Ct. App. 1998). Still, the plaintiff must show "that an unintendedly false representation was made in connection with the making of a contract and that the injury suffered

7

as a consequence of the misrepresentation inure to the benefit of the party making the misrepresentation." *Id.*

The IEP entities allege that Delphi made misrepresentations about remaining in the fuel cell business. (R. 24, PID 372–73.) They further allege that those representations were made "in connection with the making of/modifying" the amended promissory note, security agreement, and guaranty, and that they would never have entered into those agreements if Delphi had not made those misrepresentations. (R. 24, PID 372–73.) IEP also alleges that it was damaged and suffered losses, and those losses "inured to the benefit of Delphi." (R. 24, PID 373.) During the hearing on the motion, counsel for the IEP entities further explained that they would not have pledged their intellectual property as security for the promissory notes had they known Delphi was leaving the fuel cell business.

Accepting as true all these factual allegations, IEP and IEPT state a plausible claim that, but for Delphi's alleged misrepresentations, they would not have entered into the security agreement, and that Delphi benefitted because it now has rights to IEP and IEPT's intellectual property. *See Iqbal*, 556 U.S. at 678. So the innocent-misrepresentation claim, as it pertains to the Security Agreement, will not be dismissed.

But to the extent IEP and IEPT are also seeking to assert an innocent misrepresentation claim with respect to the 2013 MOU, that claim will be dismissed for failure to allege any benefit inuring to Delphi (in 2013) by failing to inform IEP and IEPT of its tenure in the fuel cell technology business.

**IV.**

Delphi also seeks dismissal of IEP and IEPT's breach-of-contract claim. The MOU states, and both parties agree, that the MOU is governed by Colorado law. (R. 24-2, PID 382.)

The IEP entities allege that Delphi breached the MOU by failing to inform them of its decision to leave the fuel cell business and that, as a result of the breach, they incurred significant expense. (R. 24, PID 374–75.)

Under Colorado law, a breach-of-contract claim has four elements: "(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *Matthys v. Narconon Fresh Start*, 104 F. Supp. 3d 1191, 1204 (D. Colo. 2015) (internal quotation omitted).

When interpreting a contract, "courts should not rewrite the provisions of an unambiguous document but must enforce the unambiguous document in accordance with the plain and ordinary meaning of its terms." *USI Prop. East, Inc. v. Simpson*, 938 P.2d 168, 171 (Colo. 1997) (en banc). To determine whether there is any ambiguity, "the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed." *Id.* If a contract is free from ambiguity, it "will be found to express the intention of the parties and will be enforced according to [its] plain language." *Id.* External evidence can *only* be reviewed to prove intent if there is ambiguity. *Id.* That parties have different interpretations of a contract does not alone create an ambiguity. *Id.*

Delphi argues, in essence, that the IEP entities' breach-of-contract claim fails because the MOU is an unenforceable agreement to agree; and, even if the MOU were enforceable, it imposes no obligation on Delphi to disclose its future business plans. The Court agrees.

## C.

In determining whether the MOU created a binding contract between Delphi and IEP, the "essential question" under Colorado law is: "Did the parties mean to contract by their correspondence, or were they only settling the terms of an agreement into which they formally

9

proposed to enter after all its particulars had been adjusted, and by which alone they intended to be bound?" *New York Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405 (10th Cir. 1996) (citing *Pierce v. Marland Oil Co.*, 278 P. 804, 806 (Colo. 1929)); *see also Engineered Data Prod., Inc. v. Art Style Printing, Inc.,* 71 F. Supp. 2d 1073, 1074 (D. Colo. 1999) (explaining that courts look to determine "if [the] terms are specific enough to constitute a contract" and "if the parties intended the [document] to be a binding contract"). In *New York Life Insurance*, the court found that, "[a]t best, the Master Commitment can be characterized as an agreement to agree or a contract subject to conditions precedent which were never fulfilled. In either case, [defendant] would not be bound by such an agreement." *Id.* at 411; *see also Griffin v. Griffin*, 699 P.2d 407, 409 (Colo. 1985) (en banc) (agreements to agree are generally unenforceable because courts are unable "to force the parties to reach an agreement and cannot grant a remedy"). Thus, "[When] the language of an agreement demonstrates that the document is merely an agreement to agree, a court can rule as a matter of law, without resorting to extrinsic evidence, that no binding contract exists." *Engineered Data Prod., Inc.*, 71 F. Supp. 2d at 1078.

The Court begins with the plain language of the MOU. *See Higby Crane Serv. LLC v. Nat'l Helium, LLC*, 751 F.3d 1157, 1166 (10th Cir. 2014). It explicitly states that, "[t]he parties agree that the terms of this MOU are not legally binding." (R. 24-2, PID 380.) It simply lays out "*intended* terms of the Agreement" and states that "[e]ither party has the right to terminate discussions at any time and for any reason prior to entering into the *definitive Agreement contemplated by this MOU*." (R. 24-2, PID 384) (emphasis added). This clear and unambiguous language stands in direct contrast to *Gates Corp. v. Bando Chemical Industries, Ltd.*, where the Tenth Circuit enforced a memorandum of understanding because the memorandum explicitly

10

stated that "[t]he parties intend [the] Memorandum to be a binding, legally enforceable agreement." F. App'x 676, 682 (10th Cir. 2001).

Additionally, in order for the MOU to constitute a binding contract, there must be "agreement as to its essential terms." *Engineered Data Prod., Inc.*, 71 F. Supp. 2d at 1080. The MOU makes clear that the parties still need to work out essential terms. It states that the "parties shall, in good faith, *seek to work out the details* for a formal joint technology development agreement." (R. 24-2, PID 380.) The MOU does not articulate any essential terms for how the parties should work out those details, nor does it set any timetables or define "good faith."

The Court therefore construes the MOU as an unenforceable agreement to agree.

The IEP entities resist this result by asking the Court to strike the language in the MOU that "[t]he parties agree that the terms of the MOU are not legally enforceable." But "[c]ourts possess no authority to rewrite contracts and must enforce unambiguous contracts in accordance with their terms." *Radiology Prof'l Corp. v. Trinidad Area Health Ass'n, Inc.*, 577 P.2d 748, 751 (Colo. 1978) (en banc); *see also USI Properties East, Inc.*, 938 P.3d at 173.

## D.

Even if the MOU were an enforceable agreement, its plain and unambiguous language does not impose any obligation on Delphi to disclose business decisions.

IEP and IEPT ask the Court to change the MOU by reading in a duty to disclose. They argue that the duty of good faith and fair dealing creates an implied duty to disclose.

It is true that, under Colorado law, "every contract contains an implied duty of good faith and fair dealing." *Dalton v. Countrywide Home Loans, Inc.*, 828 F. Supp. 2d 1242, 1254–55 (D. Colo. 2011) (quoting *Newflower Market Inc. v. Cook*, 229 P.3d 1058, 1064 (Colo. App. 2010)). This doctrine exists "to effectuate the parties' intention and honor their reasonable expectations."

*Dalton,* 828 F. Supp. 2d at 1255 (internal quotations omitted). The duty of good faith and fair dealing does not, however, "obligate a party . . . to assume obligations that vary or contradict the contract's express provisions. Nor does the duty of good faith and faith dealing inject substantive terms into the parties' contract. Rather, it requires only that the parties perform in good faith the obligations imposed by their agreement." *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. App. 1994).

The plain language of the MOU does not create a duty on the parties to disclose their business decisions. To the contrary, the MOU explicitly disclaims any such obligation by stating that "neither party shall have any obligation or commitment to enter into an Agreement *or to otherwise engage in business activities with the other party* unless and until the terms of such business relationship is accepted by the parties' respective management and the Agreement is executed by authorized representatives of both of the parties." (R. 24-2, PID 380) (emphasis added). Because the MOU did not impose upon Delphi an obligation to engage in business activities with IEP, and because the terms of the MOU are not legally binding, it is not plausible that the MOU legally obligated Delphi to inform IEP of its decision to leave the fuel cell business. This argument therefore fails.

IEP and IEPT have failed to allege a plausible claim that Delphi breached the MOU.

## V.

Accordingly, the Court GRANTS Delphi's Motion to Dismiss as to Claims I, III and IV, and DENIES the motion as to Claim II.

SO ORDERED.

Dated: November 30, 2017

s/Laurie J. Michelson  
LAURIE J. MICHELSON  
U.S. DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

       The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 30, 2017.

                                                s/Keisha Jackson
                                                Case Manager